## Millingar *versus* Hartupee.

1. A 'vessel with a cargo of cotton owned by Gearing and running the blockade was captured by a government vessel, and proceedings were commenced in a Prize Court to condemn vessel and cargo; part of the cotton was released by consent of the government and captors to Millingar, claiming to be the owner of that part. *Held*, that the proceedings in the Prize Court did not affect the ownership of the released cotton, but left it as if there had been no seizure or capture.

2. There being no condemnation there was no change of title; the government and captors put an end to any supposed rights they had by their voluntary act.

3. Millingar was accountable to Gearing for the cotton notwithstanding he obtained possession of it through the unlawful act of Gearing, and Gearing himself could not have obtained it.

4. The cotton had been shipped to Millingar to pay Gearing's creditors, &c.; the relation between them was that of principal and agent, and Millingar had no further interest in the cotton than as a creditor of Gearing to receive an equal share with other creditors.

5. If an agent receives money for a particular purpose and refuses so to apply it or to account for it; or misappropriates it or applies it after his authority is countermanded, an action for money had and received will lie at the suit of the principal.

6. Millingar having attempted to hold the cotton as his own, and disavowed his agency, forfeited claim for compensation.

7. An attachment execution lay by a judgment-creditor of Gearing, and was properly levied on the debt due by Millingar.

ERROR to the District Court of *Allegheny county*.

This was an execution attachment, issued December 27th 1864, by Andrew Hartupee against Charles Gearing, on a judgment against the latter, the debt being $5026. James Millingar was the garnishee; he pleaded *nulla bona*.

The circumstances under which the questions in this case arose are the following: About 1860 Charles Gearing, the defendant, had contracted debts at Pittsburgh amounting to nearly $25,000; one of his creditors was Millingar, the garnishee. Gearing went to Texas in 1860, and remained there, with the exception of a short visit home, until 1864. He there purchased a schooner, changed her name to "Reindeer," and put on board of her 288 bales of cotton. The vessel sailed from the Brazos river to run the blockade. She was captured and proceedings were instituted in the District Court for the Southern District of New York, for the condemnation and forfeiture of the vessel and cargo. On the 27th day of February 1863, in that court, it was "ordered that proceedings herein be discontinued, so far as relates to 73,533 pounds of cotton, being a portion of the above-named cargo, belonging to James Millingar, of Pittsburgh, Pa., and that the marshal release and deliver the same to the said James Millingar or his attorney." The vessel and the rest of the cargo were afterwards condemned. The cotton thus released to Millingar was

[Millingar v. Hartupee.]

sold by him, and after deducting expenses and allowances claimed by him, there remained in his hands the sum of $25,949.70.

The plaintiff alleged and gave evidence to show that the cotton had been purchased by Gearing with the intention of shipping it to Havana or New York, selling it and having the proceeds transmitted to Millingar to pay Gearing's debts, if enough, in full, if not, *pro rata*, and should there be a balance to pay it to Gearing's wife for the use of his family.

Millingar alleged, and gave some evidence on the point, that he agreed with Charles Gearing, through his son and agent, Frank Millingar, that Charles should invest the amount of his indebtedness to Millingar in cotton at eight cents per pound, that the cotton released to him by the government was cotton which had been so bought for him and claimed it as his own.

The grounds upon which the parties stood in the court below are fully set out in the charge of Hampton, P. J., approved by the Supreme Court. After stating the facts, Judge Hampton charged :—

" The plaintiff alleges that this cotton was purchased by Gearing with the intention of sending it to Havana, there to be sold, or if it would command a higher price in New York, it was to be taken there and sold, and the proceeds sent to Millingar to be appropriated to the payment of his, Gearing's debts, and if not enough to pay the whole, then *pro rata*, and the balance, if any, to be handed over to Gearing's family, to be kept till he came home. That his debts amounted to from $20,000 to $25,000. That Millingar, who was one of his creditors, assented to this arrangement, by virtue of which he procured this cotton, sold it and received the proceeds, some $50,000, and therefore he is bound to carry the arrangement into effect, by reason whereof the plaintiff issued this execution attachment and attached the money in his hands.

" The defendant interposes three objections to the plaintiff's right to recover. Two of them involve questions of law—and the other a question of fact.

" 1. That the plaintiff has shown no title to this cotton in Gearing, or to the proceeds thereof at the time of the service of the attachment or since. In support of this position he contends that this vessel carrying this cotton having run the blockade, was subject to seizure and confiscation by the government, and having been captured, Gearing's right to the cotton in dispute was forfeited, and by the proceedings in the United States District Court, the cotton was condemned, and the subsequent release by the government of this cotton to Millingar, vested the title absolutely in him, and as the plaintiff in this proceeding must claim through Gearing, if he has no title, there can be no recovery.

[Millingar *v.* Hartupee.]

" 2. Admitting the plaintiff's allegations to be true that this cotton was purchased and sent North by Gearing to pay his creditors, and that the defendant received it from the government in trust for those creditors, the proceeds thereof when sold to be distributed amongst them, such alleged trust cannot be enforced by execution attachment, the only remedy of the creditors being by a bill in equity for an account. ·'

" 3: That he never agreed to receive the cotton or its proceeds for the benefit of the other creditors of Gearing. But that in January 1861, Frank Gearing, son of Charles Gearing, came here from Texas with a power of attorney from his father to settle up his business, and under and by virtue of that authority he agreed with Mr. Millingar to invest in cotton at eight cents a pound, in Texas, the amount of his claim against his father, and advise Millingar of the investment. It was to be held in the name of Charles Gearing until the Federal forces should take the place, and then be turned over to them for him (M.). That from the time Millingar was advised of the investment, the cotton was to be at his risk. He further alleges that the same arrangement was made with G. W. Coffin, another of Gearing's creditors, at the same time.

" Let us now consider the defendant's first ground of defence.

" It will be readily conceded by all, that the vessel with its cargo, being owned by a person resident in Texas, which was one of the states in rebellion, whether he were friend or enemy, loyal or traitor, in attempting to run the blockade, after its owner was fully apprised of the fact that a blockade had been legally declared and established, was liable to capture and condemnation by the authorities of the United States as a prize of war. See The Prize Cases, 2 Black 635. And if the government had proceeded to exercise its authority in the condemnation, forfeiture and sale of this cotton in dispute, as it did the remaining portion of the cargo and vessel, all parties would have been bound thereby. Thus far there is no dispute about the law. The learned counsel, however, differ as to what was done by the court in the premises. The defendant's attorney alleges the action of the court on the 17th of February 1863, was a judgment by default against all claimants, and equivalent to a formal decree of condemnation against the vessel and cargo, by which the title of Gearing was divested, and the same was *ipso facto* vested in the United States, or in the United States and the captors jointly. Whilst the plaintiff's counsel denies the correctness of this position, and contends that no judgment nor decree whatever, affecting the title to the property captured, was pronounced on that day, nor until after this cotton had been released and delivered to the garnishee, and therefore Gearing's title, if he had any before, remained in him, unimpaired by that proceeding: 1 Curtis 359. A brief re-

[Millingar v. Hartupee.]

view of this record will be sufficient to settle this question beyond doubt or cavil."

The judge then details the proceedings in the Prize Court, and proceeds:—

" On the 27th of February 1863, the following order was made by the court, viz.:—

" ' On reading and filing the consent of E. Delafield Smith, United States District Attorney, and F. H. Upton, of counsel for the captors, it is hereby ordered that proceedings herein be discontinued as far as relates to 73,533 pounds of cotton, being a portion of the above-named cargo, belonging to James Millingar, of Pittsburgh, Pennsylvania, and that the marshal release and deliver the same to the said James Millingar or his attorney.'

\*    \*    \*    \*    \*    \*    \*

" That portion of the decree, in reference to the condemnation, is as follows, viz.:—

" ' This cause having been heard on the libel, and proofs and testimony taken *in preparatario*, no claim having been interposed, and the default of all parties having been taken in open court, and due deliberation being had in the premises, now, on motion of E. Delafield Smith, Attorney of the United States, It is ordered, adjudged and decreed by the court, that the schooner " Reindeer," formerly the " Jefferson Davis," her tackle, &c., and that portion of her said cargo not heretofore released, be condemned and forfeited to the United States, on the ground that the said captured property is lawful prize of war, &c., &c.,' and a writ of venditioni was ordered.

" By these records, which impart absolute verity, it clearly appears that while this case was pending in the Prize Court, and before any decree or sentence of condemnation or forfeiture was pronounced, a *discontinuance of the proceedings*, so far as they related to the cotton now in controversy, at the instance of the proper officers of the government, and the counsel for the captors, was allowed and entered of record by the court. This discontinuance took place on the 27th of February, and the decree of condemnation and forfeiture on the 18th of March, in which this cotton is expressly excepted. From all which it follows that Charles Gearing's title to this cotton, if he ever had any, remained the same after the capture and after its delivery to Millingar as before. The only parties, to wit, the government and the captors, who had a right to claim the forfeiture, expressly waived their right, and all others are concluded thereby : 2 Conklin 522.

" Millingar, therefore, must stand in the same position, precisely, as if there had been no blockade, and he had received the cotton from the Reindeer, at the hands of her supercargo, under the bill of lading.

" Chancellor Kent lays down the law as follows :—

[Millingar *v.* Hartupee.]

" By the modern usage of nations, neither twenty-four hours' possession, nor the bringing the prize *infra præsidia*, is sufficient to change the property in the case of a maritime capture. A judicial inquiry must pass upon the case, and the present enlightened practice of commercial nations, has subjected all such captures to the scrutiny of judicial tribunals, as the only sure way to furnish due proof that the seizure was lawful. The property is not changed in favor of neutral vendee or recaptor, so as to bar the original owner, until a regular sentence of condemnation has been pronounced by some'court of competent jurisdiction, belonging to the sovereign of the captor ; and the purchaser must be able to show documentary evidence of that fact to support his title. Until the capture becomes invested with the character of prize by a sentence of condemnation, the right of property is in abeyance, or in a state of legal sequestration. It cannot be alienated or disposed of, but the possession of it by the government of the captor is a trust for the benefit of those who may be ultimately entitled. This salutary rule, and one so necessary to check irregular conduct and individual outrage, has been long established in the English Admiralty, and it is now everywhere recognised as the law and practice of nations : 1 Kent's Com. 102–3.

" In this proceeding by execution attachment, the plaintiff is placed in the position, and acquires the rights of his debtor, as regards the garnishee ; and after an answer filed and issue joined, the same presumptions of law arise upon the trial from any particular evidence, as if there had been no attachment, and the suit had been by the creditor of the garnishee against him : Fessler *v.* Ellis *et al.*, 4 Wright 248. Whenever a party has a right of action, his creditors may attach it, unless it be for wages : Park *v.* Matthews, 12 Casey 28. An attaching creditor stands in the shoes of his debtor ; and any equities that could be set up against him are equally available against the former : 10 Casey 299 ; 1 Wright 491.

" These and many other cases, decided by the Supreme Court, show conclusively that the present plaintiff, being an attaching creditor of Charles Gearing, stands in his shoes, with all the rights he would have in an action brought by him against Millingar to recover the proceeds of this cotton ; and the only inquiry is, could he maintain such an action ? In examining the question, we must not be led astray by false names. We must look at the true character of the transaction rather than to the name by which it may be called. In order to test the correctness of the defendant's position, we will suppose Charles Gearing was indebted to sundry persons here, including the defendant, in the sum of $25,000 ; that he and James Millingar went to Texas together, and after some time Millingar being about to return home, Gear-

[Millingar v. Hartupee.]

ing placed in his hands $30,000, with directions, when he reached home, to take out of this sum, say $5000, the amount of his own claim, and pay to the other creditors $20,000, the amount of their claims, and hand over the remaining $5000 to his wife, to be kept by her until his return. This Millingar agreed to do, took the money, came home, and instead of performing his promise, neither paid a dollar to any one of the creditors, nor handed over a dollar to Mrs. Gearing, but put the whole in his pocket. When Gearing comes home and ascertains that Millingar has violated every promise he made when he received the money, he brings an action against him for money had and received to his use. Millingar sets up as a defence that he is not the agent of Gearing, but a trustee for the creditors, and, therefore, he cannot recover ; the creditors must proceed against him by bill in equity for an account. Who can doubt for a moment that such a defence would be unavailing, if not frivolous ?

" In such a case he would simply be the agent of Gearing, rather than the trustee for the creditors, and liable to be sued as such for a breach of his contract to pay over the money.

" But again, suppose the creditors, who were no parties to this alleged trust, would refuse to file a bill against Millingar, and proceed to collect claims from Gearing, as they might do, what then would become of the money in Millingar's hands ? The creditors refuse to collect it from him, and Gearing, as the defendant now says, cannot sue him and collect it, and as a consequence he puts the money in his own pocket. Such case would be rather a novel chapter in our jurisprudence.

" And how would such a case differ from the present, if the plaintiff's theory be correct ? He alleges that Gearing, being indebted to sundry persons here in the sum of $20,000 or $25,000, went to Texas, purchased some 288 bales of cotton, and, in pursuance of an agreement with Millingar, who was one of his creditors, that he would receive the cotton or its proceeds if sent to him, and after paying himself and the other creditors, hand over the balance to his wife, to be kept for him until his return ; sent the cotton to Millingar, who received over 70,000 pounds of it, sold it for over $49,000, and after paying all expenses, actually has in his pocket over $25,000, and refuses to pay over a dollar of it either to Gearing himself or to any of his creditors, and now, when this execution-attachment is issued by one of these creditors, who, as we have shown, stands in Gearing's shoes, entitled to all his rights if he were the plaintiff, sets up the defence that this proceeding cannot be sustained ; that he must be called upon by bill in equity for an account, although he says he is not bound to account. What defence would be then set up to the bill ? That he had faithfully executed his trust by paying out all the money that came to his hands in pursuance

[Millingar *v.* Hartupee.]

of his instructions? He could have pleaded that fact in this action if true, and if proved, it would have constituted as good a defence here as in a bill in chancery. But he has neither pleaded nor proved, nor attempted to prove any such fact. On the contrary, he has denied, both by his plea and by proof, that he has any money in his hands belonging to Gearing; that he ever agreed to act in this matter, either as the agent of Gearing or the trustee for the creditors. The law will not permit him to avail himself of the advantages of a position which he utterly denies he ever occupied. We therefore instruct you, that in this proceeding, Hartupee, the attaching-creditor, stands in Gearing's shoes, and if Millingar is indebted to Gearing in any amount, upon a fair settlement of their accounts, the plaintiff is entitled to your verdict.

" The only remaining question in the case is a question of fact, to be determined by the jury, viz., What was the agreement between Gearing and Millingar about the purchase of this cotton, and the disposition to be made of the proceeds? And as you find that fact to be, so will be your verdict. And this question divides itself into two branches, viz.:—

" 1st. If, as the defendant alleges, Franklin Gearing, acting as the agent of his father, made an absolute bargain with Millingar, without any condition about submitting it to his father for his approval, that Charles Gearing should invest the amount he owed Millingar, in cotton, in Texas, at eight cents a pound, for his own use; and this cotton, now in dispute, was purchased under that agreement, and only amounted to what Gearing owed Millingar, at eight cents a pound, then the cotton belonged to Millingar, and the plaintiff cannot recover.

" 2d. But if, as the plaintiff contends, this cotton was purchased by Gearing for the benefit of all his creditors, and sent to Millingar with instructions to sell the same and apply the proceeds to the payment of their claims, if sufficient to satisfy all, and the surplus, if any, to be handed over to his wife for him; and if not sufficient to pay the full amount, then to be divided *pro rata* among them; if this was the arrangement under which the cotton was sent and received, the plaintiff is entitled to recover in this form of proceeding, and the only remaining question is, what amount is, or ought to be, in his hands liable to attachment?

" In order to answer this question, we must ascertain whether anything, and, if so, how much, the defendant is entitled to retain out of the money in his hands for costs, expenses, time, trouble, care, &c., in procuring and selling the cotton.

" By the 26th section of the Act of 14th June 1836, Purd. 971, it is provided that, ' it shall be lawful for any court having jurisdiction as aforesaid, whenever compensation shall not have been otherwise provided, to allow such compensation to assignees

[Millingar v. Hartupee.]

and other trustees, out of the effects in their hands, for their ser-
vices, as shall be reasonable and just.' Here we have the rule
given us by statute in this state for compensation to all trustees
who act honestly and are disposed to deal fairly by the trust-fund;
but this compensation is merely matter of grace and will be with-
held whenever the conduct of the party merits such punishment:
Ex parte Cassel & Spayd, 3 Watts 443–5. And in Swarts-
walter's Account, 4 Id. 77, it was held that an administrator
or trustee, who in the management of the funds acts unfaithfully
and dishonestly towards his *cestui que trust*, will be allowed no
compensation on the settlement of his account, and Mr. Justice
Kennedy, in delivering the opinion of the court, says: ' Now, it
is entirely inconsistent with every principle of retributive justice,
that a trustee who betrays the confidence reposed in him and
attempts to defraud the *cestui que trust* by appropriating the
trust-funds to the discharge of a pretended claim of his own,
should receive the same reward that is due to virtue only, and
given as a remuneration for services rendered with a view to
advance the interests of the *cestui que trust*. On principles of
policy, as well as those of morality and justice, in order to insure
a faithful and honest execution of the trust as far as practicable,
it would be inexpedient to allow to the trustee who has acted dis-
honestly and with an intent fraudulently to convert the trust-
funds to his own use, the same compensation with him who has
acted uprightly in all respects and with a single view to promote
the true interests of his *cestui que trust*. The withholding com-
pensation altogether in the first case, and bestowing it only in the
latter, may have a tendency to deter trustees from attempting
anything unfair in the execution of the trust, and induce them
at the same time to perform their duties with common honesty at
least, if not with all the skill and diligence that might possibly
be applied;' and to the same point are the cases of Say v. Barnes,
4 S. & R. 116; Aston's Estate, 5 Wh. 228; Dyott's Estate,
2 W. & S. 566; Fournier v. Ingraham, 7 Id. 31; McCahan's
Appeal, 7 Barr 59; Drysdale's Appeal, 2 Harris 537. In Steh-
man's Appeal, 5 Barr 414, it was said by the court below whose
judgment was affirmed by the Supreme Court, ' An opinion
seems to prevail that a trustee is always, and under all circum-
stances, to be paid a commission upon the funds which pass
through his hands. * * * It is time that it should be distinctly
understood that a trustee may not only be made to pay the cost
of litigation improperly carried on for his own benefit, but that
he can receive no compensation for his services, when he has
shown a want of good faith and ordinary care and diligence in
the execution of the trust.' The same salutary principle was
applied to the case of an attorney who neglected to pay over

3 P. F. Smith—24

[Millingar *v.* Hartupee.]

money received for his client until sued: Bredin *v.* Kingland, 4 Watts 420; 2 Lead. Cas. in Eq., Hare & Wallace's Notes 443–4.

"These are but a few of the cases in Pennsylvania with which our reports abound, all going to show that when a trustee, or any person acting in a fiduciary capacity, fraudulently withholds money in his hands belonging to his *cestui que trust*, he thereby forfeits all claim to compensation for any service he may have rendered in regard to the trust fund.

"And it is equally well settled that every agent or trustee is bound to keep an account of the funds intrusted to his care, and render the same whenever properly called on, and if he fails to do so every fair presumption may be made against him. Now, according to the foregoing authority, when no compensation is fixed by the party creating the trust, any compensation allowed by the law is mere matter of grace, falling under the equitable powers of the court, and consequently, as we have already seen, it being unequitable and against good morals to allow compensation to one who has acted fraudulently, no allowance whatever can be made in such a case for services.

"Let us now apply this rule to the case before us.

"If you find that Millingar in this cotton transaction was acting as the agent or trustee of Gearing and his creditors, or as the agent of Gearing alone, without the knowledge of his creditors, and if his conduct has shown, not only a want of good faith, but an evident attempt to defraud those who trusted him, by trumping up a claim to this cotton or its proceeds which is false and unfounded, then we instruct you that he is entitled to no compensation for his services, nor for any alleged expenditures of money without clear and satisfactory proof as to how and for what purpose, and how much was necessarily expended. And if he has failed to satisfy your minds in regard to these points, if you find for the plaintiff at all, you may charge him with what the cotton was worth at the time it came into his hands, and, after deducting the amount of the two attachments that precede this, and Gearing's indebtedness to him, you may find the balance to be in his hands, liable to be attached."

The jury found for the plaintiff, and also that Millingar had in his hands as garnishee liable to attachment $27,336.60. There were a number of exceptions taken by the defendant to the decisions of the court on questions of evidence, to the answers to points submitted, and to the charge and the rulings of the court in them. These were assigned for error.

What is given will sufficiently present the case as it was considered and decided in the Supreme Court.

*Hamilton & Acheson*, for plaintiff in error, cited Riddle *v.* Etting, 8 Casey 412; 3 Wallace 419; 2 Black. 674; Vattel,

[Millingar v. Hartupee.]

B. 3, ch. 9, § 164; 1 Bouv. L. Dict. 205, tit. *Captor;* 1 Kent's Com. 59, 101, 102; Wheat. Internat. L., pt. 4, ch. 2, § 11, p. 408, § 16, p. 431; McDonough v. Dannery, 3 Dal. 188; Clark v. Prot. Ins. Co., 1 Story 109–134; United States v. Bags of Coffee, 8 Cranch 398; 2 Bouv. L. Dict., tit. *Prize;* 3 Wash. C. C. 183; 2 Conkling's Adm. Pr. 132; 1 C. Robinson 67–80; 2 Id. 64; Lestapies v. Ingraham, 5 Barr 81; Dunlap's Adm. Pr. 161, 166, 411; Upton's Mar. Warf. and Prize Law 404; Story Confl. of L., ch. 15, § 592; Bonnea v. Dinsmore, 24 Law Rep. 381; 19 Leg. Int. 108; 10 Pitts. Leg. J. 97; Dennison v. Goehring, 7 Barr 175; Bright. Eq., § 131; Reeside v. Reeside, 13 Wright 325.

*N. P. Fetterman, R. Woods* and *J. Barton,* for defendant in error, cited Brown v. United States, 8 Cranch 140; 2 Bouv. L. Dict. 384; 1 Kent's Com. 102–3; Slocum v. Mayberry, 2 Wheat. 1; Havelock v. Rockwood, 8 T. R. 268; Smith's Merc. L. 170; Stevens v. Bagwell, 15 Ves. 139; The Margaretta, 2 Gallis. 563; Wheat. Internat. L. 434–439; Bay's R. 471; Rose v. Himili, Bee's Adm. R. 304; Wheelwright v. Depeyster, 1 Johns. 471; Jenkins v. Putnam, 1 Bay 8; Miller v. Ship Resolution, 2 Dallas 1; Gelston v. Hoyt, 3 Wheat. 248; United States v. Bags of Coffee, *supra;* Act of July 7th 1862; 26th June 1812; 2 Conkling's Adm. Pr. 456, 459, 526; Fessler v. Ellis, 4 Wright 248; Park v. Matthews, 12 Casey 28; 2 Grant 136; Driesbach v. Becker, 10 Casey 152; Riley v. Hirst, 2 Barr 346; Reed v. Penrose, 12 Casey 214; Reeside v. Reeside, 13 Wright 322; Childs v. Digby, 12 Harris 27; Breading v. Siegworth, 5 Casey 396; Garrigues v. Harris, 5 Harris 350; Peterson v. Speer, 5 Casey 479; Frederick v. Gray, 10 S. & R. 182; Barnhart v. Pettit, 10 Harris 135; Evans v. See, 11 Id. 88; Williams v. Williams, 10 Casey 312; Lacy v. Arnett, 9 Id. 169; Burns v. Sutherland, 7 Barr 103; Dennis v. Alexander, 3 Id. 50; Wright v. Woods, 11 Harris 120; Newman v. Edwards, 10 Casey 32; Weamer v. Juart, 5 Id. 257; Reeves v. Del. L. W. Railroad Co. 6 Id. 454; Raush v. Miller, 12 Harris 277.

The opinion of the court was delivered, January 14th 1867, by

READ, J.—The very elaborate opinion of the learned judge below prevents the necessity of doing more than to notice the principal points of the case, and to give in a brief form our views in regard to them. First, we agree with the learned judge that the proceedings in the Prize Court did not affect the ownership of the released cotton, but left it as it would have stood if no capture or seizure had taken place. There being no condemnation of it, no change of title took place, and the government and

[Millingar *v.* Hartupee.]

the captors had put an end to any supposed rights of theirs by their own voluntary act. Upon this point we think the reasoning of the court below is conclusive.

Then the garnishee claims this cotton as his own, being purchased in Texas by his debtor, who thus paid his creditor by investing his debt in cotton, and sending it to him in that shape. This the jury have directly negatived, and even if we differed from them it is not our province to criticise or to interfere with their decision upon that point, as it was not the property of the garnishee, so neither are its proceeds in his hands, and this brings us to the real question in the case.

This cotton was purchased by Gearing with his own money, and, of course, was his property; was shipped for Havana, there to be sold, and the proceeds to be remitted to James Millingar, Pittsburgh, Pennsylvania, he to pay the indebtedness of Gearing *pro rata* to each creditor, and if there was over enough to pay them, the balance was to be given to his wife, Mrs. Gearing, for him. This was distinctly submitted by the court to the jury, and found by them. Owing to the capture, the cotton came directly into Millingar's hands, and was by him turned into money. In Lestapies *v.* Ingraham, 5 Barr 71, it was held that where one by fraud obtains compensation for injuries done to the property of another, who himself was unable to make a claim therefor, the receiver is accountable to the party whose property is injured; so here, if the cotton was released upon a representation that it belonged to Millingar, he is accountable to Gearing for it. Under this state of facts the relation between them was that of principal and agent, with specific instructions as to the application of the money the proceeds of the cotton, in which Millingar has no further interest than as a creditor of Gearing to receive an equal share with the other creditors.

If an agent receives a sum of money from his principal, with instructions to apply it to a particular purpose, and he refuses to apply it to that purpose, or to account for the same, an action for money had and received will lie against him, and so this action will lie, if he misappropriates the money, or applies it to the particular purpose after his authority so to apply it is countermanded: Chitty, Jr., on Contracts, by Russell, 6th ed. p. 546.

This is the condition of the garnishee, who has forfeited all claim to compensation by a fraudulent attempt to hold this cotton and its proceeds as his own, and disavowing entirely all agency for his principal, Gearing, who could therefore bring an action for money had and received against Millingar, and against whom therefore his attachment-execution lies, and has been properly levied upon the debt due by the garnishee to Gearing, the judgment-debtor of the plaintiff.

[Millingar *v.* Hartupee.]

All the other questions are either immaterial in this view of the case, or were properly disposed of by the court, and there is therefore nothing in the fifteen specifications of error.

Judgment affirmed.